U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED   LAFAYETTE

OCT 2 6 2015

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF LOUISIANA**

**LAFAYETTE DIVISION**

| | |
|---|---|
| IN THE MATTER OF THE COMPLAINT | CIVIL ACTION 14-469 (LEAD) |
| OF OMEGA PROTEIN, INC. | 15-3468 (MEMBER) |
| AS OWNER OF THE ISLE DERNIERE, | |
| FOR EXONERATION FROM OR LIMITATION | JUDGE HAIK |
| OF LIABILITY | |
| | MAGISTRATE JUDGE HANNA |

## REASONS FOR JUDGMENT

This matter came before the Court for Trial beginning on September 8, 2015 and concluding on September 9, 2015.

## PROCEDURAL HISTORY

This dispute arises from an allision which took place in the early morning hours of September 5, 2013 between the F/V Isle Derniere, a pogy boat owned and operated by Omega Protein, Inc. (Omega) and the M/V Lady Lauren, a tug owned and operated by Louisiana Marine Towing. On February 28, 2014, Omega filed a Complaint for Exoneration From or Limitation of Liability. On December 17, 2014, Louisiana Marine Towing filed a Complaint for Exoneration From or Limitation of Liability. Anthony Scott, Charles Brumfield, Jr., and Robert Lancelin filed claims for personal injuries in both suits. Omega and Louisiana Marine Towing made claims in each other's suits. Ultimately, the matters were consolidated.

On July 28, 2015, this Court granted summary judgment in favor of Louisiana Marine Towing, finding it was entitled to exoneration from liability as no evidence in the record supported a finding of fault on the part of the M/V Lady Lauren.

Prior to the beginning of trial, the claims of Anthony Scott were settled by the parties. Robert Lancelin, Sr. and Charles Brumfield, Jr. proceeded to trial with Omega.

A Motion to Strike Economist's Report was filed by Omega Protein (Doc. 110).  The motion was based on a factual error in the report of G. Randolph Rice, which was ultimately corrected and the report was admitted without objection.

A Motion to Increase Limitation Fund was filed by Charles Brumfield, Jr. on September 3, 2015 which will be addressed herein.

**FACTUAL HISTORY**

In the early morning hours on September 5, 2013, the F/V Isle Derniere, a fishing vessel commonly referred to as a "steamer", was heading north in the Vermillion River toward its home port, the Omega plant located between Abbeville and Intercoastal City.  It was carrying approximately 1,333,000 pogey fish in its hold on the return trip.  The M/V Lady Lauren, a tug with a six pack of barges was also heading north in the Vermillion River at the time.

At some point in the return journey, the Isle Derniere, piloted at that time by David Newhouse with Chris Wilmore on lookout, encountered the M/V Lady Lauren, which was being piloted by Donald Theriot, assisted by a deckhand named Cantrell.  Technically, Ira Shelton was the Captain of the Isle Derniere, but the vessel was being piloted during Captain Shelton's break by the "bosun" David Newhouse.  The evidence undisputedly shows a radio communication was initiated by the Isle Derniere, who wished to pass the Lady Lauren, and a two-whistle passage was agreed upon by the vessels.  Further, the evidence establishes that all parties involved believed the pass could be safely undertaken and the river was wide enough for the maneuver. At some point during the maneuver, the Isle Derniere allided with the Lady Lauren.  This Court has previously determined that the contact was not through the fault of the Lady Lauren.

Robert Lancelin, Sr., Charles Brumfield, Jr., and Anthony Scott, all Omega employees aboard the Isle Derniere, claim they were injured as a result of the allision.

## ANALYSIS

The exoneration from or limitation of liability is a two step inquiry.  First, a Court must determine what acts of negligence or conditions of unseaworthiness caused the accident. Secondly, the Court must determine the shipowner's knowledge or privity of those same acts. *Farrell Lines, Inc. v. Jones,* **530 F.2d.7 (5th Cir., 1976).**  The petitioner in limitation bears the burden of proving a lack of knowledge or privity.

The evidence in this case clearly establishes the cause of the accident was the fault of the Isle Derniere.  Following the two-whistle passing agreement between the vessels, the undisputed testimony of Captain Theriot established that he ran his vessel aground deep in the bend and took his vessel out of gear since as it was stationary.  All eye witnesses agree a passage agreement was made, a safe passage was possible, and the river was wide enough for a passage without contact. All evidence presented places the blame for the allision solely on David Newhouse.  Captain Theriot testified:

> "No, I know, but I don't want to get ahead of the game. But when I called and told him I was aground, I was watching him. He kept coming. He looked good. He passed me up on the side of the boat, and he just kept coming and went straight to my barges, bounced off the middle, boom (indicating), just kept going. I said, "What the hell?" He just got -- kept coming and coming and just boom. He just kind of -- he just kept going.  Pretty cut and dry how it happened. He had a lot of river to the port. He didn't have no reason to go over there." **(Theriot Deposition, Page 54, Lines 13-24)**

At trial, Captain Shelton testified that he did not know why the vessels allided, but the area was wide enough to safely pass. **(Trial Transcript, Vol. 1, Page 162, Lines 3-9 and Page 165, Lines 22-24)** Further, Captain Shelton testified that it appeared Mr. Newhouse made a bad

judgment call. **(Trial Transcript, Vol. 1, Page 166, Lines 4-6).** Captain Shelton testified that he would have been able to successfully complete the maneuver. The record fails to establish any fault outside that of Omega. In its report to the Coast Guard following the accident, Omega classified the incident as an allision, rather than a collision.

There were various theories of how the accident happened and failures of the parties involved, including the report of Leslie Eschete, a marine consultant hired by Mr. Lancelin. As noted, this Court has determined there to be no fault on behalf of the Lady Lauren and summary judgment in Louisiana Marine Towing's favor has been entered. No matter the cause of the allision—whether it be suction or pilot inattentiveness—the accident was caused through the fault of Mr. Newhouse. The testimony of all eye witnesses clearly established there was sufficient room to make the pass safely and that Mr. Newhouse, for whatever reason, piloted his vessel too close to the Lady Lauren.

The claimants argue the vessel was unseaworthy because it lacked a properly licensed and trained crew. They assert that, pursuant to 46 U.S.C. section 8304, a person may not serve as a master, mate, or engineer without the proper tonnage license if the vessel is operating on the "high seas". They note that Captain Shelton testified the Isle Derniere operated outside of the 12 mile boundary line routinely. Because it crossed the boundary line and exceeded 200 gross tons, a second sufficiently licensed mate was required to be onboard.

Captain Shelton established through his testimony that, although they would take multi-day voyages where he would need to rest, requiring a second person to pilot the vessel, Omega did not have a second licensed person in command on the vessel **(Trial Transcript, Vol. 1, Page 167, Line 1 through Page 170, Line 13)**. Mr. Wilmore was unlicensed and Mr. Newhouse held an expired 200 ton license. Captain Shelton did state that, a small percentage of the time, he may

take the boat outside of the 12 mile boundary.  He testified that, in transit, he may take the boat out to 15 miles.  **(Trial Transcript, Vol. 1, Page 175, Line 23 through 177, Line 4)**.

There was no specific testimony as to the amount of time the boat may have spent outside of the boundary line, no records presented showing the boat was routinely operated on the high seas, and no evidence establishing that either David Newhouse or Brain Wilmore served as a master, mate, or engineer on the vessel while it was being operated on the high seas. **Consequently, the Court finds the evidence fails to support the applicability of 46 U.S.C. section 8304 in this case.**

Captain Shelton testified that he believed both David Newhouse and Brian Wilmore were competent operators.  He further testified that he trained them through experience on the job. Newhouse had made the voyage up and down the Vermillion River on numerous occasions. Further, it was not the norm in his line of work to have a second 1,600 ton licensed captain aboard a pogey boat.  Additionally, he testified in detail to the work of Mr. Newhouse and Mr. Wilmore in operating the main boat as well as the purse boats during the course of their employment with Omega **(Trial Transcript, Vol. 1, Pages 190-193)**.  Outside of this incident, there was no evidence to suggest Mr. Newhouse was not a competent operator.

**The Court finds the negligence of David Newhouse, who was piloting the Isle Derniere at the time of the accident, was the sole cause of the allision and resulting injuries in this case.  Omega, as his employer, is liable for the resulting damages.  The evidence failed to establish the unseaworthiness of the vessel through the incompetency of the crew.**

Limitation is available if Omega proves that it lacked privity or knowledge of the unseaworthiness and/or negligence which caused the accident.  The privity or knowledge of the owner turns on the facts of each particular case.  *Coryell v. Phipps,* 317 U.S. 406 (United States

**Supreme Court, 1943).** Omega did not present evidence specifically negating knowledge or privity, but the evidence as a whole satisfies the burden of establishing a lack of same on the part of Omega.   David Newhouse's negligence has been established as the sole cause of the accident. No evidence was offered showing any prior incidents involving Mr. Newhouse or suggesting Mr. Newhouse was an incompetent operator. Further, his direct supervisor considered him a competent operator.  Omega could not have had knowledge, as there was nothing prior to this accident suggesting Mr. Newhouse would negligently operate the vessel.

**Consequently, the Court finds Omega is entitled to a limitation of liability, as it had no privity or knowledge of the negligence which caused the accident at issue.**

**VALUE OF VESSEL**

Turning to the value of the vessel, the Court notes Omega originally claimed the Isle Derniere had a value of $117,000.  This value was based on the Affidavit of Value executed by Michael Wilson, a former Omega employee who now acts as a consultant for the company. Mr. Wilson admittedly did not make a recent inspection of the vessel in determining its value, but instead based his opinion on the scrap value, despite the fact the Isle Derniere is still a working vessel. Mr. Wilson failed to fully explore the possibilities with respect to potential sales or other uses for the boat and he failed to include the value of the purse boats, equipment, or 1.3 million fish aboard the vessel at the time of the allision.  The Court finds Mr. Wilson's valuation of the vessel was inadequate.

In its Opposition to the Motion to Increase, and in its Post Trial Memorandum, Omega adjusted the value of the Isle Derniere to $387,077.83, which includes the book value of $235,050 set forth by Mr. Wilson, plus  the value of her purse boats set by Omega at $113,370.83,   and the $38,657 in fish on board at the time of the allision.  The Court finds this

valuation is still unreliable and lacking.

Claimant Charles Brumfield, Jr. filed a Motion to Increase Limitation Fund (Doc. #104) on September 3, 2015.  In it, Brumfield argues the limitation fund should be increased to either $3,000,000, the insured value of the Isle Derniere at the time of the incident, or $1,250,000, the value assessed by marine surveyor Timothy Anselmi, who was retained by Louisiana Marine Towing during this litigation. **Given the woefully low estimate of value provided  by Omega, the Motion to Increase Limitation Fund is GRANTED.**

Under the Limitation Act, a vessel's value includes its appurtenances and equipment, as well as the value of the pending freight at the end of the voyage.  *46 U.S.C. section 30505.* Generally, in assessing the market value of a vessel in the Fifth Circuit, courts are instructed to look to the sale of comparable vessels.  In the case of *In Re Omega Protein, Inc.,* **2007 WL 803934 (W.D. La. 2007),** the court wrote: 'The usual and customary method for determining damages is the market value of the vessel in the case of loss. *Carl Sawyer, Inc. v. Poor*, 180 F.2d 962, 963 (5th Cir. 1950), citing *Standard Oil Co. v. Southern Pacific Co.*, 268 U.S. 146, 45 S.Ct. 465, 69 L. Ed. 890 (1925)."  If no comparable sales are available, courts may consider "evidence such as replacement cost, depreciation, expert opinion, the amount of insurance, *see E.I DuPont de Nemours & Co., Inc. v. Robin Hood Shifting & Fleeting Serv., Inc.,* 899 F.2d. 377, 379 (5th Cir., 1990), the cost of reproduction less depreciation, the vessel's condition, and the uses to which it can be put..." *M/G-T Servs., Inc. v. Turn Servs., Inc.,* **2001 WL 1386065 (E.D. LA, 2001).**

Mr. Timothy Anslemi, an independent and  licensed appraiser with no relationship to any party to this litigation, valued the vessel at $1,250,000.  His appraisal process and methodology are clearly set out in his report which this courts finds to be reliable and in line with legal

precedent.  Mr. Anselmi also relied on methodology outside of the market value to arrive at his opinion as he noted no comparable vessels were available at the time of his calculations.  This amount, which includes the purse boats and equipment, plus the $38,657 in fish aboard the vessel, is a more accurate and reliable valuation of the Isle Derniere.

**Based on the foregoing, the value of the Isle Derniere is determined to be $1,288,657.00.**

## PERSONAL INJURY CLAIMS

Although the outward damage to the vessels suggests the force from the allision was minimal, testimony of the crewmembers suggests it was strong enough to cause some degree of impact inside the Isle Derniere.  Anthony Scott testified that he was thrown against a wall, suffering injuries which required surgery.  He classified the impact as an eight or nine out of ten. **(Trial Transcript, Anthony Scott, Page 278, Lines 20-23)**.  He testified that Captain Shelton advised him not to sign off on the accident report if he did not witness the accident, as the question specifically referred to witnessing the accident.

**CHARLES BRUMFIELD**:  Charles Brumfield, a 48 year old man and an Omega employee for approximately eight (8) years at the time of the accident, worked most of those years as a fisherman under Captain Shelton.  Mr. Brumfield's work consisted of heavy manual labor.  Prior to each fishing season, Mr. Brumfield was sent for a physical exam, including MRIs and back x-rays.  Mr. Brumfield was always cleared for work.

Mr. Brumfield testified that he was sleeping in his top bunk, facing the wall at the time of the accident. He said the impact felt like a hard, unexpected push or jerk.  He woke up stiff and sore, but that was not unusual in his line of work after a week of fishing.  The morning after the accident, he said Captain Shelton advised him that, if he did not witness the accident, he was not

to sign off on the accident sheet. He says he did advise Captain Shelton at the time that he felt the impact.

The following night, Mr. Brumfield stated he was on his way home when his pain started to worsen. He experienced stiffness and pain in his back. He says he went to The Lake After Hours, where he was met by his wife, and was refused treatment because the injury was accident related. The next day, he went with his family to the occupational medical center referred to him by Lake After Hours where he was again refused treatment. He testified that he self treated his injuries over the weekend, returning to work on Sunday feeling somewhat better. He testified that he wanted to finish up the fishing season where he would be eligible to receive his bonus. Admittedly, he did not report his pain to Omega, because he believed he could make it through the season. He further admitted he did not sign the accident report presented by the investigator as he had given a verbal statement.

Shortly after the accident, an investigator was called to the Omega plant and met with Mr. Brumfield regarding the accident. Mr. Brumfield told the investigator he was in pain and wanted a medical evaluation. He was sent to Dr. Gidman, along with Anthony Scott and Robert Lancelin. Mr. Brumfield testified that he reported his back and neck pain to Dr. Gidman, noting it began after the accident. Dr. Gidman performed an MRI and deemed Mr. Brumfield unable to work pending the results. Dr. Gidman diagnosed him with a herniated disc at C5-6 and a right lateral broad based disc bulge at L4-5. Mr. Brumfield was ultimately sent to a neurosurgeon for a second opinion. He testified that, by the time he saw Dr. Stanger, he was experiencing tingling in his arms in addition to the pain.

Dr. Stanger recommended physical therapy which Mr. Brumfield stated he completed. By November 8, his second visit with Dr. Stanger, Mr. Brumfield testified he was experiencing left arm numbness. He ultimately saw Dr. Patel for lumbar injections, at the recommendation of Dr. Stanger. The injections, prescription medication, and additional physical therapy, gave him some back relief. The injection only helped his neck, however, for a few days. Dr. Stanger gave Mr. Brumfield limited options and he chose to have surgery.

Mr. Brumfield had a cervical fusion and anterior cervical decompression surgery on April 2, 2014. He was in a surgical collar for approximately eight weeks and on pain medication following the surgery. He attended follow up visits with Dr. Stanger for four months after the surgery. He testified the surgery gave him relief from the numbness and tingling and he regained strength in his left arm. He says he felt better following surgery. By August 12, 2014, his last visit with Dr. Stanger, he classified his pain level as a two or three out of ten. Currently, he states he has pain on and off, with occasional spasms and stiffness. He is not currently working, but is helping with his son and disabled brother.

The Court finds Omega's negligence entitles Mr. Brumfield to recovery under the Jones Act for his resulting injuries. The evidence, including Dr. Stanger's testimony, shows Mr. Brumfield's back and neck issues, which resulted in lumbar injections and surgery, were caused by the allision which took place on September 5, 2013. Prior to this date, Mr. Brumfield worked five seasons fishing for Omega, passing a physical exam before each.

Omega has paid for Mr. Brumfield's medical treatment. He seeks $350,000.00 for past and future general damages.

**ROBERT LANCELIN:**

Robert Lancelin, currently 72 years of age, had worked for Omega for approximately twenty (20) years prior to the September 2013 accident.  He completed a physical examination prior to each season and was cleared for work.  At the time of the allision, he was working as a rung setter, which does not require a large amount of heavy manual labor.

Mr. Lancelin testified he was asleep in his bunk at the time of the allision.  He stated his head was near the area of the boat which made contact during the accident and that he woke up dizzy and numb on the right side of his body.  He admits he did not have a bump or cut of any kind and that he did not fall and/or hit the floor.  Following the accident, he claims he made his way to the other crew members in the galley, took some Advil, and returned to the bunk room to watch TV.  He admits he did not formally report his injuries and failed to fill out an accident report at any point prior to the end of the hitch.  He further admits he did not report his injuries to Captain Shelton.  He did originally note he was injured on the report as he exited the boat, but claims he changed his response based on advice from Captain Shelton.

The weekend following the accident, Mr. Lancelin testified he did not see a doctor, visit an emergency room, or visit any walk in clinics.  He returned to the boat on Sunday.  He testified he was determined to finish the fishing season in order to collect his bonus and maintain his insurance.  He claims he did so with the aid of pain relievers.

Mr. Lancelin testified he first saw Dr. Edison Ong shortly after the accident for his injuries, but no reports from Dr. Ong were produced and he was not listed on Mr. Lancelin's witness list.  Mr. Lancelin stated Dr. Ong diagnosed him with gout in his left knee, but he believes it was an injury to his knee from the rail on the boat. He stated, "That's the one had told me it was gout.  That's when we decided it was the rail on my leg." **(Trial Transcript, Vol. 2,**

**Page 425, Lines 23-24).** He claims he bumped his knee on the rail of the bed during the accident and his leg was swollen, but the medical records presented show Mr. Lancelin failed to raise this issue with the doctors he saw following the accident.   Further, no evidence in support was offered.  He also testified to visiting an emergency room at some point, but no supporting evidence or medical records were offered.

He then testified he saw Dr. McPherson, who regularly treated him for a number of ongoing conditions, including diabetes, high blood pressure, and gout on September 12, 2103, one week after the accident.  This appointment was scheduled prior to the accident.  He testified Dr. McPherson did not treat him for any head, neck, knee, or back injuries.  In fact, he never mentioned the accident or any resulting physical problems to Dr. McPherson at his September 2013 appointment.

On September 18, 2013, a couple of weeks after the accident, the claimants were interviewed and asked to give a statement at the Omega office.  Prior to this time, Mr. Lancelin did not report any injury.  It was at this time Mr. Lancelin saw Dr. Gidman, after telling the investigator, Brian, he was injured.  On September 18, 2103, Dr. Gidman ordered further testing and advised Mr. Lancelin to refrain from work until after his follow up visit on September 23, 2013.  He underwent an MRI of his back and neck and a CT of his brain at Laborde Diagnostics. The results of the CT scan were normal.  The MRI showed some minor bulging at C4-5, with no cord or root compression and moderate bulging C5-6, with no cord or root compromise.

**(Lancelin Exhibit 4-G).**  On September 23, 2013, after reviewing the test results, Dr. Gidman opined Mr. Lancelin suffered a strained neck and a head contusion with intact skin on the right side of his head.  There was no note indicating Mr. Lancelin raised a knee complaint.  His CT scan and MRI did not raise any concerns for Dr. Gidman.  Dr. Gidman advised him to continue

with over the counter pain medication as needed and released him to return to work.  **(Lancelin Exhibit 4-G)**

Mr. Lancelin admits he did not follow the advice given, but instead decided to use his son's doctor, Dr. Olson.  He further admits to not signing an accident report that day as he was uncomfortable signing any papers because of his poor reading skills.  He did, however, sign a similar report in 2001 for an unrelated incident.

Following the season, Mr. Lancelin says he visited Dr. Olson, a neurologist, on December 5, 2013.  Dr. Olson originally reported Mr. Lancelin appeared to have "sustained significant head trauma and a damaged cervical disc as the direct result of the accident in question".  **(Lancelin Exhibit 4-A).**  Dr. Olson also interpreted the MRI findings from Laborde Diagnostics as showing "a substantial disc herniation at C5-6" and "some significant change at C4-5",  **(Lancelin Exhibit 4-A).**  He treated him with pain medication and referred him for testing and further evaluations.  On November 5, 2014, Dr. Olson noted "the next stop should be at the neurosurgeon and orthopedic surgeon."  Dr. Olson continued monitoring Mr. Lancelin and prescribing pain medication until August 2015.

Mr. Lancelin was evaluated in January 2015 by Dr. Bradley Bartholomew, a neurosurgeon, who rendered a clinical note on January 22, 2015.  In it, Dr. Bartholomew noted Mr. Lancelin had not tried any physical or chiropractic therapy for relief of his symptoms.  On February, 12, 2015, Dr. Bartholomew noted he received the MRI scan of Mr. Lancelin's cervical spine dated 9/19/2013 showing a "minor bulge at C4-5" and a "dessication and a small bulge" at C5-6.  He agreed with the findings by Laborde Diagnostics and opined, "Most likely, this was previous degenerative disease in a 71 year old which is now symptomatic." **(Lancelin, Trial Exhibit 4-F).**  He recommended cervical facet blocks "if he is hurting bad enough", which he

would arrange if Mr. Lancelin desired.  Mr. Lancelin argued Omega failed to approve the injections, but did not offer evidence of necessity or a causal connection to the accident.

Mr. Lancelin further underwent evaluations on February 9, 2015, March 9, 2015, and March 13, 2015 by Dr. Melissa Aubert and Dr. Susan Andrews, Clinical Neuropsycholgists. They diagnosed him with depression.  They report the depression worsened following the accident <u>and</u> the death of his common-law wife.  Further, they found his self-reported forgetfulness and memory difficulties are the result of "normal aging processes and his current depression."  They did not directly correlate his mental state to the accident or name the accident as the sole cause of his depression.  They concluded, "Overall, the results of objective test data do not clearly indicate neuropsychological impairment related to the previously described accident."  They did, however, note he would likely benefit from outpatient treatment for depression, chronic pain, and sleep disturbance.  Further evaluation may be necessary if his depression worsens, they stated.  There is no evidence showing that is the case. **(Lancelin Exhibit 4-B)**

Mr. Lancelin testified he is unable to perform all of the activities he used to since the accident, including working in his garden and that he is taking medication for stress.  He testified he had planned to work three (3) or four (4) more years before his injury, but he was told by Dr. Olson he could not return to work.  He further testified Omega has failed to pay all of his medical bills.  His attorney submitted an opinion from G. Randolph Rice as to past and future earning capacity.  Significantly, Dr. Rice originally calculated Mr. Lancelin's case based on a February 10, 1956 birthday when he was actually born June 8, 1943.  The report was revised to reflect the correct birth date prior to filing.  Dr. Rice valued the sum of past and the present value of future amounts at $92,444.00.  He alternatively found that, if Mr. Lancelin could return to work at a

lesser rate of pay, he estimates the total to be $44,708.00.  In total, he seeks an award of between $400,000.00 and $600,000.00

Omega argues the crew members failed to fill out an accident report and, perhaps, participated in a conspiracy to conceal their injuries until the end of the fishing season where they would receive a bonus.  Omega presented some evidence of an overheard conversation to that effect.  In fact, the defendants signed certifying they had not witnessed an accident and were uninjured.  The testimony of Mr. Scott, however, was that Captain Shelton advised them to not sign the report because they did not witness the accident.  Further, Mr. Lancelin originally filled in the "yes" box, but for some unknown reason, crossed it out.  Although the injured men should have filled out an accident report or reported their injuries at an earlier time, and Mr. Lancelin and Mr. Brumfield both admitted to knowing and understanding the Omega rules and regulations for doing so, the Court can not find from the weight of the evidence that they engaged in a conspiracy against Omega.

As set forth above, the Court finds the sole negligence of Omega Protein, Inc. resulted in the allision which took place on September 3, 2013 between the F/V Isle Derniere and the M/V Lady Lauren. It is further held, the allision resulted in the injuries claimed by Mr.  Charles Brumfield and his ultimate need for cervical surgery.   Based on the foregoing, the Court finds an award in the amount of $350,000.00 for past and future general damages, as set out by the claimant,  is reasonable and adequate based on the extent of Mr. Brumfield's injuries, the surgery and treatments he received, and the relationship he proved between his injuries and the accident. With respect to interest, the Fifth Circuit Court of Appeals holds, "Under maritime law, the awarding of prejudgment interest is the rule rather than the exception, and, in practice, is well-nigh automatic." *Offshore Marine Contractors, Inc. v. Palm Energy Offshore, L.L.C.*, 779 F.3d.

345 (5th Cir., 2015).  **As such, it is hereby ORDERED that Omega Protein, Inc. pay to Mr. Charles Brumfield the sum of $350,000.00, plus prejudgment interest and post-judgment interest at the current federal rate in place on the date of judgment**.

Regarding Mr. Lancelin, the Court finds he failed to carry his burden of proof with respect to a left knee injury arising from the accident.  Further, the Court finds the opinion of Dr. Olson to be unreliable as to the extent of Mr. Lancelin's injuries and the relationship of same to the September 13, 2013 accident.  Dr. Olson's opinion differed significantly from those of Dr. Gidman and Dr. Bartholomew, as well as the test results of Laborde Diagnostics.  The Court finds, as a result of the subject accident,  Mr. Lancelin suffered a strained neck and head contusion to the right side of his head, with intact skin.  The Court further finds Mr. Lancelin failed to carry his burden of proof with respect to the cause of the cervical disc issues noted on the MRI performed by Laborde Diagnostics in September 2013.  The most compelling testimony was that of Dr. Bartholomew who opined the disc issues were likely the result of previous degenerative disease.

As to Mr. Lancelin's mental capacity and forgetfulness, the Court finds he failed to carry his burden of proof with respect to a connection between these issues and the subject accident. In fact, the evidence shows these conditions are likely the result of normal aging and depression. Drs. Aubert and Andrews specifically found no neuropsychological impairment as a result of the accident.  Mr. Lancelin testified to some depression, which was supported by findings from Drs. Aubert and Andrews, but there is scant evidence proving his depression is a result of the allision. In fact, it was noted he recently lost his common-law wife, which would, naturally, give rise to some level of depression.  Additionally, Mr. Lancelin suffers from gout, hypertension, and diabetes, further complicating his overall state.

Mr. Lancelin produced a letter report from Dr. Randolph Rice regarding his past and future wages and work life expectancy.  In *Madore v. Ingram Tank Ships, Inc.,* 732 F.2d. 475 (5th Cir., 1984), the Fifth Circuit stated, "It may be shown by evidence that a particular person, by virtue of his health or occupation or other factors, is likely to live and work a longer, or shorter, period than the average.  Absent such evidence, however, computations should be based on the statistical average."  Here, Mr. Lancelin is a 71 year old gentleman under regular treatment for diabetes, gout, and hypertension who was working a highly physical job.  Although he testified he would have liked to work three (3) or four (4) more years after the accident, he offered no evidence showing that would have been the case.  In fact, taking Dr. Bartholomew's findings as true, Mr. Lancelin was suffering from a degenerative disc disease which was beginning to manifest in symptoms.  With that, the Court can not find Mr. Lancelin falls outside of the statistical average for work expectancy.   As such, the Court finds Mr. Lancelin is not entitled to past and future wage losses.

Based on the foregoing, the Court awards Mr. Lancelin **$75,000** for pain and suffering resulting from a strained neck and head contusion.  This amount is fair and reasonable given the evidence presented and the testimony of Mr. Lancelin. **Omega Protein, Inc. is hereby ORDERED to pay to Mr. Robert Lancelin, Sr., the amount of $75,000.00, with prejudgment and post-judgment interest at the current federal rate in place on the date of judgment.**

THUS DONE and SIGNED on this 26th day of October, 2015.

**RICHARD T. HAIK, SR., DISTRICT JUDGE**